Plaintiff, Heyden Chemical Corporation, is engaged in the business of manufacturing chemicals for industrial use. Among its products are formaldehyde and pentaerythritol. Heyden is the oldest commercial producer of formaldehyde in the United States and at present has but six competitors. 45% of the formaldehyde manufactured in the United States is made by Heyden and a large part of its income is derived from this source.
Pentaerythritol was developed in 1935 by one of the research chemists employed by Heyden at its Garfield plant. Commercial production of the substance was started in 1939. In this field Heyden has but four competitors and alone is responsible for 50% of the national production.
The defendant, Burrell, entered the service of Heyden in 1940 as a chemical engineer in the research department. In 1943 he was made the head of the department and continued in that capacity until he resigned in 1946. Burrell had used formaldehyde prior to his entry into the service of the plaintiff *Page 469 
but had had no experience with the manufacture of either formaldehyde or pentaerythritol. Neidig was originally employed in 1942 as a chemical engineer in the Heyden research department. He was later transferred to the technical sales division where he was working at the time of his resignation from the company's employ in May of 1946. Demarest was employed by Heyden as a chemical engineer and served in that capacity until his resignation in 1947. Neither Neidig nor Demarest had any experience with the manufacture of formaldehyde or pentaerythritol prior to his association with the Heyden Company.
In the course of their employment by Heyden all three defendants became thoroughly familiar with its research program and manufacturing processes. Burrell, upon becoming head of the research department, directed the research and experimentation in connection with both formaldehyde and pentaerythritol. Demarest, who was engaged by Heyden in 1942, was occupied at first with general engineering design. Later he was transferred to the production department where he supervised the production of both formaldehyde and pentaerythritol. And Neidig, both through his connection with the research department and the technical sales department, gained an intimate knowledge of research and production methods.
After their retirement from the service of Heyden, Burrell and Neidig formed a corporation known as Burrell Neidig, Inc. The defendant, Demarest, joined the Burrell Neidig organization upon his retirement from the Heyden organization in 1947. In the prospectus issued by Burrell Neidig, Inc., and in trade journals, the defendants held themselves out as consultants in the field of industrial chemistry, specializing in the manufacture of formaldehyde and pentaerythritol and in the designing of plants for the production of both substances.
Claiming that the defendants had disclosed and were about to continue the disclosure of information which, it charged, was a trade secret, Heyden filed its bill in the old Court of Chancery seeking an injunction against the defendants. An *Page 470 
interlocutory injunction was signed and the matter came on for final hearing.
The manufacture of formaldehyde is a process consisting of a number of integrated steps. The same is true of pentaerythritol. The basic ingredients used in the production of both substances are well known to the chemical profession. There are approximately 850 scientific articles, patents and treatises upon the subject of formaldehyde and five or six hundred on the subject of pentaerythritol. The literature, generally speaking, deals with variations of the manner of treatment and combination of the basic ingredients. And the variations are almost as numerous as the articles written upon the subject.
Since the plaintiff claims that its processes of manufacture are secret the hearings were held in camera. Any discussion of the evidence, therefore, must necessarily be general. However, it appears from the testimony that slight variations in the process of manufacture result in pronounced changes in the end product. By laboratory experiments and the use of pilot plants, Heyden has constantly sought to improve its manufacturing processes and product. Large sums, running into hundreds of thousands of dollars have been expended on research. By rearrangement and variation of the operations constituting the manufacturing processes, Heyden has improved the grade of the products and lowered the cost of manufacture. As a result, Heyden now has processes for the production of formaldehyde and pentaerythritol which enable it to compete with the other manufacturers on better than equal terms.
Heyden claims that these processes are trade secrets. It has taken the usual methods to prevent knowledge of its operations from becoming public. Its plants are fenced in and guarded. Unauthorized persons are not admitted to the buildings. Its professional employees have been instructed neither to discuss nor write about its manufacturing processes. Like other manufacturers, Heyden has sought to prevent disclosure of those elements of its business which, it believes, give it an advantage over its competitors. With this policy of Heyden's the defendants *Page 471 
were familiar. In fact, several memoranda upon the subject were prepared by Burrell.
Defendants say that the Heyden processes are not secret. The claim is that they have been known to the trade for years and are, in fact, in the public domain. In support of this assertion there were offered in evidence various essays, treatises and patents dealing with the manufacture of formaldehyde and pentaerythritol. In my opinion, these exhibits served to strengthen the plaintiff's claim. According to the testimony, there are to be found in the scientific literature some 800 to 1,000 references dealing with the production of formaldehyde and 500 to 600 references dealing with the production of pentaerythritol. Of the references on the subject of formaldehyde about 30 were offered in evidence. A like number dealing with pentaerythritol were introduced. In every one of the exhibits the systems discussed differed in major particulars from those used by Heyden. In some even the ingredients used were different. But regardless of how different the process described might be, if it contained a single element to be found in the Heyden system, the exhibit was offered to show a public disclosure of the Heyden process. Time and again while being examined on a particular exhibit, the witness would be asked to explain why an engineer, unfamiliar with the Heyden process, in setting up a formaldehyde or pentaerythritol plant, would select one element of the process described in the reference and discard the rest. A satisfactory answer to the question was never given.
The truth is, of course, that only a person who knew the Heyden process could make the selection of literature references which were offered in evidence. Dr. Elderfield of Columbia University, who appeared as an expert for the plaintiff and who was referred to as one of the leading authorities on organic chemistry, testified flatly that an engineer unfamiliar with the Heyden system could not duplicate that system by using the information contained in the literature without long and expensive research and experimentation. An expert offered by the defense contradicted Dr. Elderfield. He stated that the setting up of a process similar to that employed by *Page 472 
Heyden was "an overnight problem." He further stated that all of the necessary information was contained in the literature. But it is interesting to note that this expert was furnished by the defendants with copies of all the literature references he used. He also received a copy of the complaint and a memorandum directing his attention to the charges to which each reference applied. During the course of his testimony the witness became hopelessly entangled in his own statements and, before he left the stand, was completely discredited.
Mr. Burrell was the chief witness for the defense. His testimony was frequently evasive and often contradictory. At one point he stated that research had not resulted in any improvement in the Heyden system. At another point he acknowledged authorship of reports lauding the results of research and urging increased expenditures for that purpose. He testified that an engineer who did not know the Heyden system could, by use of the literature, duplicate that system in an incredibly short number of days. This statement was tempered by his later testimony. And finally, in a moment of frankness, Mr. Burrell testified that recourse to the literature, backed by research and experimentation, would not enable a man unfamiliar with the Heyden process to duplicate it in all its details.
I am of the opinion that the Heyden processes are trade secrets. It is entitled to have them protected against disclosure or unauthorized use by these defendants. Stone v. GrasselliChemical Co., 65 N.J. Eq. 756; Vulcan Detinning Co. v.American Can Co., 72 N.J. Eq. 387. It is perfectly clear that these defendants, unless restrained by this court, intend, for the benefit of themselves and their clients, to capitalize upon their knowledge of the Heyden processes, which knowledge was gained while they were employed by that company. They hold themselves out as specialists in the manufacture of formaldehyde and pentaerythritol. They solicit employment as consultants in connection with the erection of plants for the production of those substances. To do business in that field they must necessarily disclose the Heyden secret processes or use them for their own benefit in competition with *Page 473 
Heyden, since the only successful manufacturing operation of which they have knowledge is that employed by Heyden. When halted by the injunction issued by this court, the defendants were engaged in remodelling the system used by another concern for the production of formaldehyde. Such suggestions and alterations as they had recommended were calculated to result in a substantial duplication of the Heyden operation.
The plaintiff is entitled to the relief it seeks. The injunction will be made permanent.